HAMITER, Justice.
These consolidated appeals were taken from judgments in two separate suits which arose out of the same facts and circumstances and in connection with the same contractual undertaking.
In one cause (No. 36,293 on the docket of the district court) William D. Roland and R. L. Roland, doing a general contracting business under the trade name of Ro *730 land Construction Company and referred to hereinafter as the Rolands, sued Roland G. Martin, conducting business as the Martin Electric Company, and also his surety, the American Casualty Company, to recover the amount expended 'by them ($2,-566.54) to complete an electrical subcontract on which Martin had allegedly defaulted. In the other suit (No. 37,781 on the docket of the district court) Martin seeks judgment against the Rolands in the sum of $2,222.30, being the balance allegedly due him on the electrical subcontract (it was for $6,517) plus some extras agreed on by the parties, he averring that he endeavored to complete his contract with due diligence and in a workmanlike manner but was arbitrarily prevented by the Rolands from doing so.
The trial court dismissed the suit of the Rolands (No. 36,293) ; it condemned them to pay unto Martin in the other suit (No. 37,781) the sum of $1,501.76; and it cast them for all costs. The Rolands are appealing.
In a written contract, dated November 5, 1946, the Rolands agreed to construct for the Louisiana State University and A & M College a complete experimental agricultural station at Chambers in Rapides Parish, Louisiana. To be provided were numerous structures appropriate to such a project, including dairy, poultry, swine and farm shop buildings, a 'beef-cattle barn, silos, a superintendent’s residence and five houses for instructors. There was no specific completion time limit set forth, the contract providing that: “The work to be performed under this contract shall be commenced within ten calendar days after written notification by the Owner to the Contractor that the work shall start and shall be fully completed without unnecessary delays and as expeditiously as possible.”
On January 7, 1947, the Rolands entered into a written subcontract with Martin whereby the latter agreed to furnish, at a price of $6,517, all labor and materials in the installation of specified electrical wiring and appliances in certain described buildings. Therein it was stipulated that: “This work to be completed in accordance with the time specified in the original contract and is subject to all of the conditions in the original contract entered into by and between the contractor and owner.” The surety for the faithful performance of this subcontract was the American Casualty Company. Martin’s work on the project commenced early in 1947.
On January 14, 1948, believing that Martin had fallen behind in his work in relation to the general contract, the Rolands addressed to him the following letter:
“Your failure to prosecute the electrical work at the Louisiana State University School of Vocational Agriculture places your contract with us in default.
“Under the terms of your contract [and] the specifications you are hereby notified that unless this condition is remedied with *732 'in ten days, it is our intention to formally place the contract in default and call upon your Surety to complete the work.” (Brackets ours.)
According to the Rolands no substantial work was performed by Martin subsequent to that communication, and on February 19, 1948, they wrote to his surety (sending a copy of the letter to Martin which, along with the previous notification, the Rolands contend constituted a putting in default) as follows:
“Reference is made to our contract with the above [Martin] on which you are Surety, copy of our letter of January 14, 1948 and telephone conversation with your Mr. Ray Bradford this date.
“As we agreed in our telephone conversation, it has become necessary to employ another Electrical Contractor to complete the work which the subject has under subcontract with us at the Louisiana State University School of Vocational Agriculture, Chambers Spur, Alexandria, La., which is in default.
“If it meets with your approval, we shall employ E. Levy and Company, Electrical Contractors, of this City to complete the contract.” (Brackets ours.)
Thereafter, the Rolands obtained and used the services of E. Levy and Company in completing the electrical work, operating under what amounted to a “cost-plus” agreement; and when employees of Martin came to the experimental station they were denied admittance. For such completion the Rolands paid $4,750.
It is the contention of the Rolands in these causes that the total of the respective amounts paid to E. Levy and Company and to Martin exceeded by $2,566.54 the price agreed upon in the latter’s subcontract, and for that excess they should be reimbursed by Martin.
The subcontractor, on the other hand, insists that he did his work in a diligent and workmanlike manner, was not in arrears with respect to the general contract, and was never actually in default. He shows .that his failure to proceed any faster was due to delays caused by the contractor and by bad weather conditions. Alternatively, he contends that he has never been formally placed in default, which was necessary since there was no specified time limit for the completion of the subcontract, arguing that the letters above referred to did not have that effect. And Martin maintains that when his workmen were arbitrarily prevented from completing the job his subcontract was breached by the Rolands, and that he is now entitled to recover from them the full contract price, plus certain agreed on extras, less the amount already paid.
First to be determined herein, obviously, is whether Martin was actually in default; that is, whether he was unreasonably in arrears on his electrical subcontract in relation to the work already performed under the general contract. No letters could *734 have had the effect of placing him in default if in fact he was not.
In proof of a default on the part of Martin the Rolands rely on the testimony of Dr. Clifford Mondart (who was in charge of the vocational school), on that of themselves, and on that of a brother, James W. Roland, who worked on the project. They also direct attention to the cost to them for completing the electrical work, asserting that the large sum paid to E. Levy and Company is indicative of how little work had been done by Martin.
Dr. Mondart did testify that in January, 1948, none of the buildings was completely wired. But he also testified that none was otherwise completed. In fact he said that as of December, 1947 and January, 1948, the dairy barn had not yet been erected. He did not say that no electrical work had been done on any of them; rather he simply stated that the electrical work in all of them was unfinished. While he testified that he was continually after the Rolands to get on with the job, it is apparent from his testimony as a whole that he was attempting to rush all phases, of which the electrical work was only one among many.
The testimony of the Rolands .is not impressive, it being too general. Both testified that the electrical subcontract had been in arrears from the latter part of 1947, but neither could give details as to the progress of Martin’s work on any particular structure.
James W. Roland, brother of the two partners forming the general contracting firm, was the timekeeper and labor foreman on the project. He, too, stated that Martin was behind in his subcontract. But he was unable to particularize with respect to the claimed delaying actions of Martin, except as to one minor incident. This witness also testified that his timebook disclosed that Martin’s employees worked only about a day and a half after the first of January, 1948. He admitted, however, that as timekeeper for the contractor it was not his regular duty to record the work of employees of subcontractors. He was asked: “* * * did. you make any notations in that book and can you tell by referring to that book what days in that period of time Mr. Martin worked out there, or some of his workers?” His answer was: “Some of the time I wrote it in the book and most of the time I phoned it into the office.” The time record, therefore, was incomplete and unsatisfactory insofar as the labor of Martin’s employees was concerned.
Contradictory to the testimony of the Rolands is that of Martin, George D. Beall, M. M. Martin and the progress reports on the construction. Martin testified that he was not behind in his subcontract; that he had been carrying out his undertaking with due diligence, in a workmanlike manner, and was ready and able to complete the job. He said that subsequent to the letter of January 14 all of the parties in interest *736 had a conference in’ which they ironed out their difficulties and it was agreed that he was to proceed. However, because of inclement weather occurring soon after the conference he was unable to immediately perform. He described such weather as consisting of temperatures below freezing, along with enduring snow and rain which resulted in the ground’s becoming practically unusable by the supply trucks. As to this his testimony is corroborated by weather reports introduced into evidence. Also, Dr. Mondart agreed that during the period of snow and rain there was very little construction activity of any kind.
The progress report of January 15, 1948, submitted by the Rolands and on the basis of which the owner made payment to them, likewise corroborates Martin’s testimony. The report, approved by the Clerk of the Works (George D. Beall) who was a representative of the owner and architect, showed that as of its date the electrical work (including materials suitably stored on the job) was about 85% complete. And Beall testified that he had approved the progress report after inspecting the project; and that, in his opinion, it was a correct estimated representation of the status of the electrical work.
Additionally, Beall stated that, as of the date he’left the project (January 17, 1948), the delay on the completion, of the entire job was not due to any one particular subcontractor and, specifically, that Martin did not cause it. He pointed out that the dairy barn was not electrically completed because the concrete floor, which had to be finished first, had not been poured; that the hanging of fixtures in residences, which Martin might have done, “would have been a disadvantage to the fellow doing the other work”, such as the painter and floor Sander; and that while the buildings were not electrically completed, neither were they finished as to any other kind of work.
Martin’s testimony is further corroborated by that of M. M. Martin, a former employee (but not a relative) who had worked on the project as an electrician. He testified in detail as to electrical work done (when the weather permitted) subsequent to the letter of January 14 and up to the time access to the project was denied; and he showed that the delays were not caused by Martin.
It cannot be concluded, moreover, that E. Levy and Company’s charge of $4,750 for completing the electrical portion of the project is indicative of the amount of work left unfinished by Martin. The Levy contract, concededly, was let on what amounted to a “cost-plus” basis; and the charge included “mark ups” on both labor and fixtures to take care of overhead, as well as profit, of the second subcontractor. Too, witnesses for the Rolands admitted that completion of an electrical undertaking by a substituted contractor costs considerably more than- when done by the original one. This is true, they said, because the new contractor, being unfamiliar with that *738 which has been performed, has to retrace practically all of the already installed wiring.
Considered as a whole the evidence in the record preponderates in favor of Martin and discloses that he was not in default at the time the Rolands excluded him from the project and prevented his carrying out the remainder of his contract. This being true the next question arising is: As the result of Rolands’ action how much is Martin entitled to recover from them?
In early cases this court has said that when a contractor is prevented from completing a contract he is entitled to recover the cost of what he has put into the work plus the loss of profits — not the full contract price. Dugue v. Levy, 114 La. 21, 37 So. 995 and Cusachs and Company v. Sewerage and Water Board of New Orleans, 116 La. 510, 40 So. 855. The Dugue case was cited and relied on in Guidry and Swayne v. Miller, 217 La. 935, 47 So.2d 721. And all of these decisions are predicated on LSA-C.C. Article 2765 which provides : “The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.” (This article was held to be applicable to subcontractors in Glassell, Taylor and Robinson v. John W. Harris Associates, Inc., 209 La. 957, 26 So.2d 1.)
Had Martin been permitted to complete his subcontract with the Rolands he would have been entitled to receive from them the sum of $2,222.30, this representing the contract price ($6,517) plus extras installed ($335) less the amount already paid him ($4,629.70). However, to accomplish the completion, according to his testimony and that of his witness Beall, additional expenditures by him totaling $1,700 ($700 for materials and $1,000 for labor) would have been necessary. And since such expenditures were not actually made he cannot, under the above cited authorities, recover for them herein; they must be deducted from what he would have been entitled to receive had he been permitted to finish the work under his contract. Hence, deducting $1,700 from the above mentioned $2,222.30, there remains $522.30, a sum for which Martin should be awarded judgment.
For the reasons assigned the judgment of the district court in cause No'. 36,293 is affirmed; the judgment in cause No. 37,781 is amended by reducing the award to $522.-30 and, as thus amended, it is affirmed. The costs of these appeals shall be paid in the proportion of half by the Rolands and half by Martin.