SAMUEL, Judge.
Plaintiff' filed this suit seeking recovery of $9,336, the alleged balance due by the defendant under a subcontract to frame four-unit apartment buildings for the defendant. Defendant answered and filed a reconventional demand for $24,721.28, allegedly the sum expended by it to rework and complete plaintiff’s work. After a trial on the merits, judgment was rendered against the defendant in the amount of $3,720. Defendant has appealed.
The record is replete with redundant and contradictory evidence, and the attorneys readily concede they cannot determine how the trial judge arrived at the amount of his award.
The record does reflect that on February 22, 1979 plaintiff and defendant entered into a contract by which plaintiff undertook to frame an unspecified number of four-unit buildings for defendant. Work began shortly thereafter, and the framing of the first five buildings was completed without major incident. However, when fourteen or fifteen buildings were in various stages of completion, defendant ceased pouring slabs for any additional buildings, informing plaintiff that the buildings already started had to be completed before any additional slabs would be poured.
Plaintiff’s evidence tends to show defendant’s handling of materials delayed its performance. Plaintiff argues incorrect material was delivered to the job and too much material was delivered, requiring plaintiff’s employees first to build an enclosure to hold the lumber and then to sort through the superfluous pieces of lumber to locate particular sizes as needed. Plaintiff contends the delay would not have been encountered had materials for each unit been delivered to the site for that unit, as originally contemplated, instead of the delivery of masses of material to one particular job site. Plaintiff also argues it was delayed by the inexperience and lack of training of the defendant’s field superintendent, who allegedly caused many delays by ordering changes to be made in the floor plan of each unit as it was framed.
Defendant points to the terms of the contract, in which plaintiff was to be paid progress payments, in eight installments, upon completion of various stages of the framing of each building. Defendant argues that after the fifth progress payment, plaintiff received approximately eighty percent (80%) of the contemplated contract price for each building and, therefore, after the fifth progress payment plaintiff’s incentive to complete a particular building was diminished and it was economically in plaintiff’s self-interest to begin building another building prior to the completion of the previous buildings. After fourteen or fifteen buildings (the record is not clear as to the exact number) were in various stages of completion, defendant stopped pouring slabs for any additional buildings as stated above. In June, 1979, a representative of plaintiff met with defendant’s general manager, who expressed dissatisfaction with plaintiff’s progress. Plaintiff claims it did *1152 not discuss the problems resulting from the inexperience of defendant’s field superintendent in order to shield him from job-action by defendant.
Shortly thereafter, plaintiff and defendant’s field superintendent concluded that an end to their relationship was inevitable. Plaintiff submitted to defendant’s field superintendent a list of work it was entitled to be paid for to that point, and after reviewing the list the field superintendent executed a letter stating that the amount due plaintiff was $16,628, of which $9,167 was paid, with the balance withheld by defendant for completion of work which should have been done by plaintiff or which was allegedly improper. These figures vary from the petition, which asserts $18,503 was due and $9,167 was paid, resulting in the demand for $9,336.
The parties offered no clear evidence to substantiate either of their claims. Plaintiff relies solely upon the letter of defendant’s field superintendent as an admission that $16,628 was actually earned by plaintiff, and that it is due $9,336.
The trial judge did not render reasons for judgment. It is evident, however, that he concluded the plaintiff was not at fault in causing the deláys complained of.
Considering the record as a whole, the evidence discloses the trial judge did not commit error in rendering judgment for plaintiff and dismissing defendant’s recon-ventional demand. While the evidence is confusing and conflicting, it justifies the conclusion that plaintiff was not in default, that defendant chose to terminate the contract, and that the delays of which defendant complains were caused by defendant’s own mismanagement of delivery of materials, impairing plaintiff’s ability to perform its framing operations more quickly.
The case is controlled by Civil Code Article 2765, which reads:
“The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.” LSA-C.C.Art. 2765.
In Glassell, Taylor & Robinson v. John W. Harris Associates,[1] the Supreme Court held this article applies to the relationship between general contractor and subcontractor as well as to the owner-contractor relationship. It also has been held that this article applies when there is a discharge without cause and does not interfere with Article 2749, which involves discharge “for cause”.[2]
In Forrest v. Caldwell,[3] the Supreme Court explained the purpose of this article as follows:
“This article is taken from the Napoleon Code, but with'a change. In that code the measure of damages was fixed by the law-givers. The proprietor, in case of an arbitrary rescission of the contract, was bound to pay the contractor his expenses, the value of all his work done, and all the profits which he could have made, if permitted to perform the contract, de toutes ses dépenses, de tous ses travaux, et de tout ce qu’il aurait pu gagner dans cette entrépise. The framers of our code seem to have favored the rule as laid down by Pothier, and preferred to leave the damages to the sound discretion of the tribunal rather than to establish a positive and inflexible standard. But it is obvious that the rule given by our code is sufficiently broad to cover the loss of profits.
The arbitrary power given to the proprietor to cancel the contract at pleasure, seems at first view anomalous and exhor-bitant. But further reflection will show, that when properly guarded by a concomitant liability, it rests upon a sound policy. As suggested by the French commentators, the reason of the law is this: after making a contract, the proprietor may *1153 find that imperious considerations make it inexpedient to go on with it. Losses may have suddenly come upon him; his fortunes may have become embarrassed, and he may find that he cannot go on without exposing himself to the risk of not being able to pay the contractor; of making an investment unsuited to his means, or ruinous in its results. The law therefore, will not hold him to a specific performance, which may injure or ruin him. But at the same time the law extends the same equitable care to the contractor, and subjects the right of arbitrary cancellation to the condition of indemnifying him. Both parties are thus protected. See Pothier, Louage, No. 440. Troplong, Louage, § 1023 et seq.”
In spite of contrary implications in the foregoing quotation, the jurisprudence has developed the following formula in assessing damages in favor of a contractor who is prevented without cause from completing a contract: He is entitled to recover the cost of what he has put into the work plus the loss of potential profits, but he is not entitled to recover the full amount of the contract price.[4] In short, the contractor will be awarded the contract price minus the amount it would cost him to complete.[5]
The above rule seems to furnish the key for determining the validity of the trial judge’s award. Both sides concede that after plaintiff met with defendant’s field superintendent and plaintiff was paid $9,167, such payment satisfied all but the last progress payment. The record shows payment of the last progress payment was conditioned upon the building passing inspection by parish authorities. At this point, however, the remaining progress payment represented all profit to plaintiff, since no further expenditures for time, labor or materials had to be made by plaintiff in order to receive the final progress payment.
Plaintiff’s general manager testified the sum due to plaintiff under the final progress payment was between $3,300 and $3,400. This figure, together with some payments for extra work performed or other items contained in the record, seems to be the basis upon which the court made its award of $3,720. In view of the wide discretion afforded the trial judge in awarding damages, we conclude the record reflects no manifest error, and we therefore affirm his award.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.

. 209 La. 957, 26 So.2d 1; Accord: Civil Code Art. 2771.

. Evans v. Delta By-Products, La.App., 52 So.2d 593.

.5 La.Ann. 220, 221.

. Roland v. American Casualty Company, 227 La. 727, 80 So.2d 387; Guidry & Swane v. Miller, 217 La. 935, 47 So.2d 721; Cusachs & Co. v. Sewerage & Water Board, 116 La. 510, 40 So. 855; Dugue v. Levy, 114 La. 21, 37 So. 995.

. Hansen v. National Surety Company, La. App., 4 Peltier’s Orleans Appeal 597.